UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DANA D. MOHAMMADI, | § | |
| | § | |
| Plaintiff, | § | Cv. No. SA:12-CV-42-DAE |
| | § | |
| vs. | § | |
| | § | |
| AUGUSTINE NWABUISI, ROSE | § | |
| NWABUISI, RESOURCE HEALTH | § | |
| SERVICES, INC. d/b/a RESOURCE | § | |
| HOME HEALTH SERVICES, INC., | § | |
| and RESOURCE CARE | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court tried this case without a jury from September 24 to 26, 2013.  Claire Rodriguez and Philip Moss, Esqs., appeared on behalf of Plaintiff Dana D. Mohammadi ("Plaintiff"); Glenn Deadman, Esq., appeared on behalf of Defendants Augustine Nwabuisi, Rose Nwabuisi, Resource Health Services, Inc., and Resource Care Corporation (collectively, "Defendants").  Plaintiff brought overtime and minimum-wage claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 62.001 et seq.  The principal issue in dispute during the trial was the number of improperly compensated and/or uncompensated hours Plaintiff worked.

The Court has considered the evidence submitted, made determinations as to relevance and materiality, assessed the credibility of the

1

witnesses, and ascertained the probative significance of the evidence presented. Upon consideration of the above, and pursuant to Federal Rule of Civil Procedure 52(a), the Court finds the following facts by a preponderance of the evidence, and in applying the applicable law to such factual findings, makes the following conclusions of law.  To the extent any findings of fact as stated may also be deemed to be conclusions of law, they shall also be considered conclusions of law; similarly, to the extent any conclusions of law as stated may be deemed findings of fact, they shall also be considered findings of fact.  See Compaq Computer Corp. & Subsidiaries v. C.I.R., 277 F.3d 778, 781 (5th Cir. 2001).

I.      Findings of Fact

        These Findings of Fact are drawn from witness testimony at trial and the parties' trial exhibits, including the undisputed facts submitted by the parties in their proposed pretrial order.  Plaintiff presented her testimony and the testimony of witness Sara Connell during her case-in-chief.  Defendants called Defendant Rose Nwabuisi and witnesses Sabrina Flores, Martha Lewis, and Raed Kadhume.

**The Nature of Defendants' Business**

        1.      Resource Health Services, Inc. d/b/a Resource Home Health Services, Inc. and Resource Care Corporation are Texas-based corporations that provide a range of in-home healthcare services, including the provision of nurses.  Resource

2

Health Services, Inc. has offices in Houston and San Antonio, Texas; Resource Care Corporation has an office in Austin, Texas.

2.      Both corporations are wholly owned by Defendant Rose Nwabuisi, who is also the Nurse Administrator in charge of the nurses.  Defendant Augustine (a/k/a Austine) Nwabuisi is the CEO of both corporations.  For the purposes of these findings of fact and conclusions of law, the Court will refer to these two companies collectively as "Resource."

3.      Resource employs over 500 employees, and annual revenues exceed $5 million.

4.      Resource has contracts with insurance companies and with state and federal agencies, including the Texas Department of Aging and Disability Services ("DADS").  These organizations refer Medicare and Medicaid patients to Resource for home healthcare services.

5.      When a patient chooses to use Resource for his or her home healthcare services, a caseworker from the contracting agency dictates which services Resource is authorized to provide to that patient.

6.      Resource employs both licensed vocational nurses ("LVNs") and non-licensed caretakers called "providers."  The former perform skilled nursing tasks such as giving injections and dressing wounds; the latter perform

3

non-licensed services such as assistance with bathing, dressing, or preparing a meal.

7.     Resource also employs additional providers, called "floaters," who work on an unfixed schedule.  If for some reason a provider cannot perform a scheduled visit, Resource sends a floater to cover that appointment and attend to the patient's needs.

### The Scope of Plaintiff's Work

8.     Plaintiff, who is an LVN, was one of three employees hired to staff Resource's San Antonio branch office when it first opened in June of 2009. Plaintiff worked in that office from June 16, 2009, to November 15, 2010. Plaintiff was later re-hired to work in Resource's Austin office in October of 2011.

9.     Plaintiff was hired to work as a Primary Home Care ("PHC") Field Supervisor for Providers and as an LVN Case Manager.  Plaintiff was responsible for ensuring quality and safe delivery of primary home care services, coordinating the provision of primary care services, and ensuring efficient and effective case management.  Plaintiff also had a number of other responsibilities, including managing the office, verifying patients' insurance, performing provider visits and skilled nursing visits, and doing marketing work.

10.     Plaintiff's regularly scheduled hours were from 8:30 a.m. to 5:00 p.m., with thirty minutes for lunch, Monday through Friday.  However, Plaintiff

testified that, due to her many responsibilities, she generally began working between 7:00 a.m. and 9:00 a.m. and finished working around 8:00 p.m. or 9:00 p.m. from Monday through Friday.  (Tr. at 38:19–24; 158:20–25; 159:1–3.) Plaintiff further asserted that she worked an average of five or six hours each weekend attending marketing events, preparing gift baskets for marketing, and scheduling or performing provider service visits.  (Tr. at 39:2–5; 52:5–6.)

11.    As explained in more detail below, the Court finds that Plaintiff did often work before and after her scheduled shift, during her lunch break, and on weekends.  However, Plaintiff's estimate of the average number of hours she worked per week is only supported in part by the evidence.

A.    Marketing

12.    Plaintiff was particularly busy with marketing work during the first few months after Resource's San Antonio office opened, because at that time attracting new clientele was the top priority.  Plaintiff faxed calendars listing the marketing activities she performed, copies of receipts, and requests for mileage reimbursements to Houston.  (See Pl.'s Ex. 1 at 2, 7; Pl.'s Ex. 3 at 2, 3, 16, 17.) Defendants, who stipulated to the authenticity of all exhibits, did not deny that Plaintiff had been reimbursed for her mileage and for the items she had purchased.

13.    Plaintiff often attended work-related marketing breakfasts, lunches, and dinners with caseworkers in order to establish relationships with them and

5

encourage them to refer patients to Resource.  Sometimes Plaintiff went out to eat with the caseworkers at places like Golden Wok; at other times, Plaintiff brought breakfast or lunch to the caseworkers' offices.

14.    Defendant Rose Nwabuisi was aware and approved of Plaintiff attending marketing meals with caseworkers.  Indeed, Ms. Nwabuisi testified that she sometimes accompanied Plaintiff on lunch or dinner meetings.  (Tr. at 263:12–264:17, 266:1–17.)  Ms. Nwabuisi insisted that this was not compensable time because Plaintiff had "volunteered" to go.  (Tr. at 265:15–266:17.)  However, as Ms. Nwabuisi's own testimony makes clear, the purpose of such meals was to promote Resource's services and maintain good relationships with case workers.  Ms. Nwabuisi clearly believed that Plaintiff was not "working" unless she was in the office or on a skilled nursing visit: "We'll call it a dinner meeting," Ms. Nwabuisi explained, "but it has nothing to do with work -- it has to do with marketing."  (Tr. at 266:5–8 (emphasis added).)  Plaintiff's Exhibit 16—an email from Plaintiff to Ms. Nwabuisi—confirms that Ms. Nwabuisi knew or should have known that Plaintiff was attending marketing lunches for the purpose of promoting Resource.  That email states in part: "Dear Rose, I would like to arrange lunch for an in-service with Ever Care[,] Mrs. Janie Daniels supervisor and Mrs. Shonna case manager . . . Stated they would love to have us out to present our company.

Also Candice at Saint Davis also would like us to come out for lunch request [sic] for us to contact Debbie Rodriguez . . . to arrange."

15.     Plaintiff occasionally set up tables at fairs and flea markets or hosted bingo games at places like nursing homes to advertise Resource's services directly to potential clients.  At these events, Plaintiff talked with potential clients about health issues, performed non-invasive procedures such as checking blood pressure, and gathered potential clients' contact information.  These events lasted anywhere from four to six hours, and they sometimes took place on the weekends.

16.     Plaintiff purchased food and small door prizes for the marketing lunches, bingo games, and other marketing events.  Plaintiff also made gift baskets for clients, particularly around the holidays.  As evidenced by the receipts she submitted for reimbursement, Plaintiff purchased these items during normal work hours, before or after work, and on weekends.  (See, e.g., Pl.'s Ex. 1 at 5 (receipt from Dollar Tree dated Saturday, June 27, 2009); Pl.'s Ex. 3 at 12 (receipt from Michaels with time stamp 5:54 p.m.; receipt from CVS with time stamp 9:42 p.m.); Pl.'s Ex. 3 at 13 (receipt from Michaels with time stamp 6:01 p.m.).)

17.     Defendants, who repeatedly insisted that Plaintiff had not been hired to perform marketing work, argued in their closing statement that Plaintiff's testimony was not credible because "Resource . . . does not get its patients from bingo parlors."  (Dkt. # 77 at 29.)  However, not only do Defendants misconstrue

Plaintiff's testimony (she testified that she hosted bingo games at places like nursing homes in order to perform outreach directly to potential patients, not that she went to bingo parlors), but their assertion is contradicted by the testimony of defense witness Raed Kadhume, who explained that "when we buy something for a bingo game, we buy a lot of stuff."  (Tr. at 521:1–4.) Thus, the Court does not find Defendants' denials credible.

18.     Similarly, when called as a witness by Plaintiff's counsel, Defendant Rose Nwabuisi acknowledged that Plaintiff had made baskets and performed marketing visits.  (Tr. at 276:18–277:19.)  But when called to testify for the defense, Ms. Nwabuisi claimed that she was "hearing all this here" (i.e., hearing about Plaintiff's marketing efforts) for the first time.  (Tr. at 371:11–15.)  In light of all the evidence—in particular, the email contained in Plaintiff's Exhibit 16 and Ms. Nwabuisi's admission that the "dinner meetings" she attended with Plaintiff "ha[d] to do with marketing" (Tr. at 266:5–8)—the Court does not find Ms. Nwabuisi's later testimony credible.  Ms. Nwabuisi knew or should have known about Plaintiff's marketing efforts.

19.     Nevertheless, even though Plaintiff testified that "[for] the first six months," setting up tables at flea markets, fairs, and churches "was an every weekend kind of thing to make sure that our clientele built up" (Tr. at 61:12–15), the Court concludes that Plaintiff exaggerated the number of times she performed

such work on weekends.  Plaintiff submitted copies of some of the calendars that she had filled out and faxed to Houston in order to be reimbursed for her mileage and expenses:  one covering the last week and a half of June of 2009 (Pl.'s Ex. 1 at 7), one for July 2009 (Pl.'s Ex. 1 at 2), one for the latter half of September 2009 (Pl.'s Ex. 3 at 3), one for the first half of October 2009 (id. at 2), and another for the latter half of October 2009 (id. at 17).  These calendars contain Plaintiff's handwritten notations regarding the marketing activities that she performed, including marketing events that she attended on the weekends, and Defendants did not deny that Plaintiff had faxed them to Resource.  The partial calendar for June covers just one weekend, but it shows that Plaintiff did visit a nursing home on that weekend.  However, while the rest of the calendars show that Plaintiff was performing work on the weekends, they do not support her claim that she spent every weekend during the first six months hosting tables and bingo games.  For example, the July 2009 calendar shows that Plaintiff attended multiple luncheons per week, often brought bagels and donuts to clients, and put on a number of bingo games; but even this calendar shows just one event on the weekend: A notation on Saturday, July 4th, indicates that Plaintiff delivered a basket with red, white, and blue flowers to a caseworker.  (Pl.'s Ex. 1 at 2.)  Plaintiff's calendar for the latter half of September does not show any marketing efforts on the weekend.  (Pl.'s Ex. 3 at 3.)  The calendars for October show that Plaintiff hosted a table at a fair at

9

Rosedale Park on Saturday, October 17, and another table on Halloween, for a total of two weekend events that month.  (Pl.'s Ex. 3 at 2, 17.)  If Plaintiff really had gone to nursing homes, churches, and fairs <u>every</u> weekend during her first six months of employment, the Court believes she would have noted as much on these calendars.  Plaintiff did not explain why she would have noted some of her weekend marketing tables but not others.  Accordingly, the Court concludes that Plaintiff did set up marketing tables, visit nursing homes, and put on bingo games on the weekends, but the evidence suggests that she did so approximately twice per month, not every weekend.

20.     Plaintiff also testified that her marketing efforts were so successful that she was bringing in an average of ten patients per week.  (Tr. at 299:1–3.) However, the Court finds that Plaintiff's estimate is overstated, because Resource had approximately 170 patients by the time Plaintiff left its employ; and this, using Plaintiff's estimate, would have represented just seventeen weeks' work. Nevertheless, in light of all the evidence, the Court finds that Plaintiff did perform substantial marketing work and that her efforts did play a large role in helping take the company from zero patients in June of 2009 to 168 patients the following year.

B.     <u>After-Hours Work from Home</u>

21.     Plaintiff occasionally worked from home.  Ms. Nwabuisi knew or should have known that Plaintiff sometimes worked from home, because Plaintiff

10

sometimes sent Ms. Nwabuisi work-related emails late in the evenings.  (See, e.g., Pl.'s Ex. 16.)  However, when confronted with such an email, Ms. Nwabuisi insisted that the email was not evidence of after-hours work because Plaintiff had sent it from her personal email rather than her work email.  (Tr. at 267:10–270:6.) Again, Ms. Nwabuisi seemed to believe that time spent on a work-related matter was not compensable if performed outside the office.

     C.    <u>After-Hours Skilled Nursing Visits, Provider Visits, and Time Spent Coordinating Provider Visits</u>

    22.    Plaintiff sometimes performed in-home skilled nursing visits after normal business hours.  These visits usually lasted thirty minutes to one hour. Each time Plaintiff performed one of these visits, she submitted to Resource a detailed patient visit record that gave information on the patient and the services performed.  (See Defs.' Ex. 54.)  Defendants paid Plaintiff a flat rate of $30 or $35 for each of these visits.  Ms. Nwabuisi admitted that Plaintiff performed skilled nursing visits on the weekend (Tr. at 255:19–21), and the patient visit records Defendants produced confirm this.

    23.    Plaintiff carried a personal cell phone and later an office cell phone that she used to coordinate replacements when Defendants' other employees missed scheduled provider visit appointments.  If Plaintiff could not find a replacement, she often performed the provider visit herself.  Finding a replacement

to cover a provider visit could take twenty to thirty minutes, and attending the visit itself could take much longer. Some of these visits took place on the weekend. Provider visits are not documented with a patient visit record, but the nurse or provider does note basic information about the visit on a log. (See, e.g., Pl.'s Ex. 15 at 4.)

24.   At first, Ms. Nwabuisi testified that Plaintiff "had no business doing provider visits on the weekend." (Tr. at 255:12–15.) Plaintiff performed skilled nursing visits on the weekend, said Ms. Nwabuisi, but not provider visits. (Tr. at 255:19–21.) However, when Plaintiff's counsel confronted Ms. Nwabuisi with PHC logs showing that Plaintiff had performed provider visits on the weekend (see Pl.'s Ex. 15 at 2, 3, 5), Ms. Nwabuisi admitted that Plaintiff sometimes performed provider visits on the weekends (Tr. at 255:12–257:21). Even after she admitted that Plaintiff sometimes performed provider visits on the weekends, however, Ms. Nwabuisi insisted that providers would only call for a floater "between 8:30 and 5:00," meaning Plaintiff would never have had to work outside normal business hours to coordinate floaters. (Tr. at 261:12–19.) Still later, Ms. Nwabuisi changed her testimony again, explaining that "95 percent of [provider visits take place] between 8:30 and 5:00" (Tr. at 264:2–7), thereby admitting that approximately one in twenty provider visits takes place before or after business hours. Finally, when called to testify for the defense, Ms. Nwabuisi seemed to forget her earlier

testimony and openly stated that providers visit patients on Saturdays and Sundays. (Tr. at 365:13–16.)  Defense witness Sabrina Flores, a Resource employee, also talked about floaters who take care of "night or weekend patients."  (Tr. at 400:2–3.)  Thus, the Court concludes that provider visits did take place outside normal business hours.

25.    In accordance with what Ms. Nwabuisi initially testified, Defense witness Raed Kadhume insisted that Plaintiff could not have been coordinating floaters to cover shifts for providers before 8:30 a.m. because providers never call outside of business hours.  (Tr. at 507:14–509:13.)  In other words, Mr. Kadhume insisted that even a provider who had an appointment at 8:30 or 9:00 a.m. would never call at 7:30 a.m. or the night before to say that he or she had fallen ill or was running late; the provider would wait until at least 8:30 a.m. on the day of the appointment to make that call.  However, the Court does not find Mr. Kadhume's testimony credible.  Mr. Kadhume testified that providers called about missing appointments on a "daily basis."  (Tr. at 508:5.)[1]  If a provider had an appointment scheduled for 9:00 a.m. and waited until 8:30 a.m. to call Resource, it would be impossible for Resource to send a floater to the patient's house to cover that appointment on time.  Moreover, as stated above, Ms. Nwabuisi eventually

---

[1]  In another instance of conflicting testimony from the defense witnesses, Ms. Nwabuisi denied that providers "frequently" missed appointments.  (See Tr. at 258:17–19; 259:15–17.)

admitted and Ms. Flores openly testified that some provider visits do take place after hours and on weekends.  If a provider fell ill on a Saturday and could not make an appointment scheduled for Sunday, it would be impossible for him or her to call Plaintiff to coordinate a floater during normal business hours.  Thus, the Court finds Plaintiff's testimony—that providers often called in the early morning or on weekends to say that they could not make an appointment (Tr. at 49:20–50:19)—more credible.  Moreover, Mr. Kadhume's testimony that providers were often irresponsible and would not call at all (Tr. at 508:7–14; 509:2–7) further supports Plaintiff's claim that she often had to perform provider visits herself when "the ball [was] dropped"  (Tr. at 531:9–20).

26.     The defense witnesses testified that, in general, Resource's policy was to send a floater to cover a provider visit within twenty-four to forty-eight hours of the original appointment.  (Tr. at 400:24–25; 401:1–9; 468:11–21; 536:13–25.) The intended implication was that there was no need for Plaintiff to cover provider visits herself, because there was plenty of time to find a replacement.  However, the Court does not find this testimony credible.  Waiting twenty-four to forty-eight hours to send a floater could mean leaving an elderly person unwashed for that time, without the ability to use the restroom, or sitting in a wheelchair overnight. Even setting aside the moral implications of such neglect, it would certainly be bad for business, resulting in angry clients and complaints to the State.  Thus, the Court

doubts that Resource's policy was truly so lax and finds more credible Plaintiff's testimony about the importance of finding someone to cover these visits in a timely manner.

D.    Plaintiff's In-Office Work

27.    When the San Antonio office first opened, there were three employees: Plaintiff, Martha Lewis, and Mayra Menchaca.  As defense witness Martha Lewis testified, Plaintiff had more experience in the home healthcare industry than any of the other employees, and she was therefore the other employees' supervisor and the office manager.  (Tr. at 436:20–23; 166:13–16.)

28.    Plaintiff testified that she was instructed to clock out at or around 5:00 p.m. and that she generally did so.  However, due to her many responsibilities, Plaintiff stayed in the office past 5:00 p.m. approximately three or four days a week to do paperwork, to coordinate provider visits, or to plan the next week's marketing efforts.  (Tr. at 91:5–18; 530:1–20.)  Plaintiff explained that she clocked out at or around 5:00 p.m. even when she had to continue working because she had been instructed to clock out at 5:00 p.m. and worried that clocking additional hours would be considered "stealing" additional wages.  (Tr. at 101:12–21; 90:18–21.) Plaintiff further asserted that Ms. Nwabuisi had told her that she would be compensated for any extra time she worked.  (Tr. at 90:23–25.)  In light of Ms. Nwabuisi's evasive testimony regarding Plaintiff's hours and rigid insistence that

Resource's office hours were "8:30 to 5:00" even in the face of evidence showing that Plaintiff had worked outside those hours (Tr. at 249:23–250:14; 255:3–6; 266:20–22; 268:6–269:3), the Court credits Plaintiff's testimony that she was firmly instructed to clock out at 5:00 p.m. and finds that the time stamps showing when Plaintiff clocked out do not necessarily indicate the time at which she stopped working.

29.    The defense witnesses repeatedly insisted that Plaintiff could not have been working additional hours in or out of the office because the office was overstaffed during the entirety of Plaintiff's employment, and there was not enough work to require her to work additional hours.  (Tr. at 379:4; 422:21–23; 434:2–15.)  The Court does not find this credible:  Defendants have over eighteen years of experience in the home healthcare industry (Tr. at 360:10) and would know how many employees were necessary; it would have been uneconomical for Defendants to keep the office overstaffed for such a long period of time.

30.    Similarly, Ms. Nwabuisi testified that there were so few patients when the San Antonio office opened that Plaintiff could not possibly have been working overtime hours.  (Tr. at 377:1–7.)  However, Plaintiff did not contend that the overtime hours she worked during her first months of employment were spent performing direct primary care.  Rather, Plaintiff testified that at the beginning the bulk of her work was spent performing marketing and outreach activities.  (Tr. at

16

42:14–18; 43:23–25.)  As the number of patients grew, so did the amount of time Plaintiff spent coordinating floaters and performing primary care.

31.     The defense witnesses also testified that Plaintiff was not a good employee—that she consistently brought her children to work, where they caused trouble and distracted her; that she left work to run personal errands multiple times per week; and that she often closed her office door to make personal calls or surf the internet.  However, the Court does not credit this testimony for a number of reasons.

32.     First, the claim that Plaintiff was a terrible employee is inconsistent with the two raises that Plaintiff received over the course of her first fifteen months of employment (raising her hourly rate from $15 per hour to $23 per hour), with Defendants' decision to rehire Plaintiff at an even higher rate ($25 per hour) in October of 2011, and with Defendants' willingness to make two loans to Plaintiff that totaled more than $5,000.  An employee who behaved as the defense witnesses claimed would have been fired, not given multiple raises and loans.

33.     Second, Plaintiff explained that she had closed her office door from time to time in order to concentrate or to make work-related phone calls because someone in the office often played music.  (Tr. at 98:19–99:17.)  Mr. Kadhume conceded that Plaintiff's door had been open most of the time (Tr. at 514:24–515:4), but testified that music could not have been playing in the office because

17

the computers had no speakers (Tr. at 515:4–19).  However, when defense witness

Martha Lewis was asked whether anyone ever played music in the office, she

directly contradicted Mr. Kadhume by answering, "Yes.  Uh-huh."  (Tr. at 471:3–

4.)  In light of the defense witnesses' conflicting testimony, the Court credits

Plaintiff's testimony that she often needed to close the door in order to concentrate

on work.

34.     Third, the defense witnesses gave conflicting and untrustworthy

testimony about whether they had ever worked outside normal business hours.

Ms. Lewis testified that she had never worked after 5:00 p.m. and that she could

not access her work email from home.  (Tr. at 451:25–452:13.)  When confronted

with a work-related email sent from her work address to Plaintiff at 6:04 p.m. (Pl.'s

Ex. 22), Lewis did not admit that she sometimes did, in fact, work after 5:00 p.m.;

instead, she insisted that she had not sent the email and hypothesized that Plaintiff

must have come into the office, logged onto her (Lewis's) computer, and sent the

email to herself using Lewis's email account.  (Tr. at 453:9–17; 455:2–5; 455:21–

456:1.)  This is not believable.  The Court finds it significantly more likely that

Lewis was in the office at 6:00 p.m. performing compensable labor for which she

was either not compensated or not paid at an overtime rate.

35.     Ms. Lewis also testified that sometimes Plaintiff was already in the

office when Lewis arrived at 8:30 a.m.  (Tr. at 437:5–10.)  However, Ms. Lewis

insisted that Plaintiff was just using the internet for personal reasons.  (Id.)

Similarly, Ms. Lewis testified that Plaintiff and her children were often in the

office on the weekends, but she insisted that Plaintiff "was probably there for

personal issues."  (Tr. at 457:11–13.)  The Court does not credit this testimony,

both because Ms. Lewis would have no reason to know what Plaintiff was doing

on her computer and because it is extremely unlikely that an employee would come

to work early or on the weekends simply to surf the internet.

36.     The Court also gives little weight to Ms. Lewis's testimony about

Plaintiff's credibility.  Lewis testified that she believed Plaintiff was dishonest

because she was trying to make her ex-husband pay child support.  (Tr. at 466:19–

467:9.)  This contention is simply nonsensical.  When pressed, Lewis stated that

she thought this, combined with Plaintiff's strict nature as a boss, made her

"mean."  (Tr. at 467:7–13.)  Neither of these examples actually goes to the

Plaintiff's credibility.

37.     The testimony of defense witness Sabrina Flores was not particularly

probative.  Flores works in the Houston office and admitted that she had only

visited the San Antonio office on a few occasions; she has very little first-hand

knowledge of Plaintiff's work habits or of whether Plaintiff was working overtime

hours.  However, Ms. Flores did testify that Plaintiff sometimes called her after

5:00 p.m. to discuss work-related matters.  (Tr. at 408:20–409:13.)  Ms. Flores also

19

testified that her present job is similar to what Plaintiff was doing and that <u>she</u> (Flores) has never had to work overtime.  Specifically, Ms. Flores testified that she "ha[d] never worked after 5:00" and had "never" sent work-related emails to or received work-related emails from Plaintiff after 5:00 p.m.  (Tr. at 412:21–413:6.) Ms. Flores was then confronted with copies of three chains of work-related emails that she had sent to Plaintiff after 5:00 p.m.  (Pl.'s Exs. 18–20.)  One of those chains contained an email Ms. Flores had sent Plaintiff at 7:20 p.m., another she had sent at 8:25 p.m., another she had sent at 8:39 p.m., and another she had sent at 8:44 p.m.  (Pl.'s Ex. 20.)  Also in evidence are two work-related emails that Plaintiff sent to Flores at around 9:00 p.m. on October 10, 2011.  (Pl.'s Ex. 16.) After seeing this evidence, Ms. Flores insisted that she could not remember sending the emails but that that these must have been days she had come into work late and needed to make up time by working in the evening.  (Tr. at 414:7–17.) Eventually, Ms. Flores conceded that she worked from home "every once in a while," but she continued to insist that it was only when she was trying to make up hours.  (Tr. at 414:18–21.)  The Court does not find this testimony credible.

38.     To the extent that Mr. Kadhume testified about the hours Plaintiff worked, the Court notes that Mr. Kadhume did not begin working for Resource until the summer of 2010, at which point Plaintiff had already been working for over eight months.  (Tr. at 482:2–16; 494:11–13; 494:14–17.)  Accordingly, Mr.

Kadhume has no first-hand knowledge of the hours Plaintiff worked during those months.  Moreover, Mr. Kadhume, like Ms. Flores and Ms. Lewis, testified that he is strictly an 8:30-to-5:00 employee (Tr. at 487:24–25), meaning he has no first-hand knowledge of the hours Plaintiff worked before and after regular business hours.

39.    Finally, Defendant Rose Nwabuisi's testimony about the hours Plaintiff worked was not credible.  Ms. Nwabuisi repeatedly insisted that all of her employees worked from 8:30 a.m. to 5:00 p.m., because those were the official office hours.  (Tr. at 250:13–14; 254:13–18; 370:4–13.)  However, Ms. Nwabuisi contradicted herself on the stand multiple times.  As stated above, Ms. Nwabuisi first testified that Plaintiff had not performed provider visits on the weekend.  (Tr. at 255:12–20.)  However, when shown Plaintiff's Exhibit 15, a log showing Plaintiff performed provider visits on the weekend, she admitted that Plaintiff had indeed performed visits on the weekend.  (Tr. at 257:12–14.)  Similarly, it was only after Ms. Nwabuisi was confronted with Defendants' Exhibit 3—a time card showing that Ms. Nwabuisi had been in town and that Plaintiff's working until 9:00 p.m. on that Wednesday had been "OKed by Rose"—that Ms. Nwabuisi conceded that Plaintiff did stay late with her on a few occasions.  (Tr. at 273:12–24.)  Another time card shows that Plaintiff was with Ms. Nwabuisi until 9:00 p.m. on September 29, 2010.  (Defs.' Ex. 48.)  Still another shows that Plaintiff worked

21

for four hours on Saturday, July 24, 2010, per Ms. Nwabuisi's instructions, completing "skilled paper work."  (Defs.' Ex. 44.)  Ms. Nwabuisi also claimed, after Defense counsel asked whether Plaintiff had "ever contact[ed] [Ms. Nwabuisi] for approval for any sort of marketing," that she was hearing about Plaintiff's marketing activities for the first time at trial.  (Tr. at 371:11–18.)  However, this is flatly contradicted by the email contained in Plaintiff's Exhibit 16, in which Plaintiff specifically informed Ms. Nwabuisi that she intended to set up two marketing lunches with caseworkers.  Because Ms. Nwabuisi repeatedly denied that Plaintiff ever worked any hours outside of her regularly scheduled 8:30 a.m. to 5:00 p.m. even in the face of documentary evidence—including Defendants' own exhibits—showing otherwise, the Court affords little weight to her testimony.

**Defendants' Payroll Records and Compensation Practices**

40.    Defendants' official, written policy was that Resource would not pay employees overtime unless the employee obtained written approval in advance. (See Defs.' Ex. 10; Pl.'s Ex. 14.)

41.    Defendants used a time card system to track employees' hours, and their stated practice was for employees to punch in and out when they arrived at and left the office.

42.    Defendants' time card system automatically deducted thirty minutes each day for the employee's lunch time, regardless of whether the employee worked through lunch.

43.    Defendants' stated policy was for employees to meet with Martha Lewis every two weeks to review their time cards before the cards were sent to Houston for payroll.  Defendant Rose Nwabuisi and Martha Lewis both testified that if an employee had worked hours that were not captured on the time sheet, the employee could tell Ms. Lewis, who would, when appropriate, approve that additional time by putting her initials next to the alteration before sending the card to Houston.  (Tr. at 252:3–11; 368:17–369:25; 458:21–459:8.)  Plaintiff and Ms. Connell both testified that this did not happen regularly.  However, the Court does note that hand-written notations on some of Plaintiff's time cards show that even when the time card indicated that Plaintiff had worked more than eight hours in one day, someone (presumably Lewis) wrote in "8 [hours]" for that day before forwarding the cards to Houston.  (See, e.g., Pl.'s Ex. 4 at 4.)  Similarly, Plaintiff's time cards for the second half of September 2009 show that she clocked approximately ninety hours (Defs.' Ex. 24 at 3) and that Ms. Lewis faxed those sheets to Houston along with a note that said: "Dana Nassouri[2] – ~~90~~ 88 hrs." (Defs.' Ex. 23 at 4.)  The corresponding paycheck shows that Plaintiff was paid for

_____

[2] Plaintiff's legal name at the time of her employment with Resource.

just eighty-eight hours.  (Defs.' Ex. 24 at 1.)  This is consistent with Ms. Lewis's

testimony that the Nwabuisis would only pay for time between 8:30 a.m. and 5:00

p.m.  (Tr. at 458:6–8.)

44.    Approximately half of the time cards Defendants produced during

discovery did not list the day, month, or year to which they apply, making it

impossible to pair them with the corresponding pay stubs.  (See, e.g., Defs.' Ex.

32, 36.)  Many of the cards are illegible.  (See, e.g., Defs.' Ex. 33 at 3; Ex. 35 at 3;

Ex. 37 at 2; Ex. 38 at 4.)

45.    It was not until the day of trial that Defendants added notations to the

time cards that indicated which months and years to which they allegedly

corresponded.  In addition, Defendants produced for the first time at trial "time

cards" for seven weeks that purport to show that every employee in the San

Antonio office clocked in at exactly 8:30 a.m. and clocked out at exactly 5:00 p.m.

(Defs.' Exs. 27–29.)  These alleged "time cards" do not look like any of the other

time cards and appear to have been made using a spreadsheet program.  At first,

Ms. Nwabuisi testified that these documents were a type of time card "that was

utilized before they received the time clock."  (Tr. at 253:16–18.)  When Plaintiff's

counsel pointed out that these documents could not have been from before the San

Antonio office had a time clock because other time cards submitted prior to these

dates were created with a time clock, Ms. Nwabuisi changed her testimony and

24

explained that there must have been a problem with the time clock.  (Tr. at 253:22–23.)  Still, Ms. Nwabuisi insisted that the employees wrote down the hours they worked when the time clock was not working and that these records were accurate.  (Tr. at 254:9–12.)  Ms. Nwabuisi's contention that these are accurate records of the hours her employees actually worked during those seven weeks—that all employees arrived at exactly 8:30 a.m. and left at exactly 5:00 p.m.—is not credible; clearly, the court finds that whoever made these documents simply wrote down the employees' scheduled shift hours.

46.     Defendants submitted the exact same time card for two different weeks: one beginning February 1, 2010, and the other beginning March 1, 2010.  (See Defs.' Exs. 33, 35.)  Because February 1, 2010, and March 1, 2010, were both Mondays, and because one card is labeled "February 2010" and the other has "3-18-2010" written at the top, these time cards appear at first to be contemporaneously maintained records of the time Plaintiff worked during two separate weeks.  However, closer inspection reveals that the time cards reflect the exact same clock-in and clock-out times and have identical hand-written notations regarding Rose Nwabuisi's visit to San Antonio.  Because Defendants submitted the same time card for two different weeks, at least one week's time card is completely missing.  Moreover, the fact that Defendants submitted the same time card for two separate weeks shows that the cards contained so little information

25

that even Defendants had difficulty matching them with the appropriate pay stub post hoc.

47.     Defendants did not produce a pay stub covering the time period from May 1, 2010, to May 15, 2010.  Defendants' Exhibit 52 asserts that that pay stub is part of Defendants' Exhibit 22 (see Defs.' Ex. 52 at 5), but that exhibit contains a pay stub for August 16 to 31, 2009.  Moreover, Defendants' Exhibit 39 groups Plaintiffs' time cards for the relevant time period with a pay stub that is purportedly for "Pay Period: 04/30/2010 – 04/30/2010" [sic].  Perhaps this paycheck was meant to compensate Plaintiff for work performed from May 1 to 15, 2010; however, the Court has no way of knowing.

48.     Defendants' time cards do not capture the numerous lunch meetings that Defendant Rose Nwabuisi and witness Martha Lewis both conceded Plaintiff attended.  Defendants repeatedly testified that their policy was to automatically deduct thirty minutes for lunch, regardless of whether or not an employee worked through lunch.  On no time card or pay stub is there any indication that Plaintiff was compensated for time spent at those lunches.

49.     Defendants' time cards do not capture time Plaintiff spent at work-related dinners, either with Ms. Nwabuisi or by herself.

50.     Defendants' time cards do not capture time that Plaintiff worked on the weekends performing provider visits.

51.     Defendants' time cards do not capture the time Plaintiff spent on the weekends performing marketing work.  The only records of these activities—the calendars that Plaintiff faxed to Resource's Houston office and emails between Plaintiff and Ms. Nwabuisi—were produced by Plaintiff.

52.     Defendants claimed that "Resource paid Plaintiff at her applicable base pay for every hour she submitted."  (Dkt. # 77 at 11.)  However, this assertion is belied by the very payroll documents Defendants produced: With a few rare exceptions (<u>see</u> Defs.' Exs. 38, 44, 48), Plaintiff was paid for no more than forty hours of work each week, regardless of the amount of time captured on her time sheet.[3]

53.     The pay stubs show, and Defendants do not deny, that Plaintiff was <u>never</u> paid at an overtime rate.

### Plaintiff's Loans from Resource

54.     Plaintiff borrowed $3,500 from Resource on March 4, 2010.  (Pl.'s Ex. 8.)  On October 26, 2010, Plaintiff borrowed an additional $1,700, for a total

---

[3] The Court notes that at the summary-judgment stage it mistakenly concluded that Plaintiff had regularly been compensated for more than forty hours per week, with all hours being paid at the regular rate.  (Dkt. # 46 at 15.)  However, the Court now recognizes that Plaintiff was paid twice per month rather than every two weeks, and thus most of her pay stubs represented eleven or twelve days' pay rather than ten.  Accordingly, Plaintiff was compensated for more than forty hours per week on only a few occasions.

of $5,200.  (Pl.'s Ex. 9.)  Defendants deducted loan payments from Plaintiff's paychecks.  (Pl.'s Ex. 10.)  In this manner, Plaintiff repaid $2,980.  (Id.)

55.     On October 25, 2010, Plaintiff applied for and was approved for two weeks of paid vacation for the days of November 1 through November 14, 2010.  (Pl.'s Ex. 11.)  Defendants withheld taxes on Plaintiff's behalf before applying the remainder—$1,411.24—to the loan.  (Defs.' Ex. 8.)  By that point, Plaintiff had repaid $4,211.24 and owed $808.76.

56.     Plaintiff did not return to work on the Monday following her two weeks of paid vacation.  Based on Plaintiff's testimony, the testimony of the defense witnesses, and an email chain between Plaintiff and Mr. and Mrs. Nwabuisi (Defs.' Ex. 56), the Court finds that Plaintiff was not—as she contends—fired during her vacation.  Instead, Plaintiff did not return to work after her vacation ended and requested additional time off due to family issues.  Shortly thereafter, Plaintiff did desire to come back to work (see Defs.' Ex. 56 at 1 (email dated "November 29, 2010 7:21 a.m.")), but by that point Defendants had indeed fired her.

57.     By this time, Plaintiff believed that she had repaid both of her loans in full, partly because she believed—based on phone conversations with Ms. Nwabuisi—that Defendants had applied certain sums they owed her for mileage and after-hours nursing visits to the loan.  (Tr. at 147:11–12; 337:8–20.)

58.     Defendants argue that Plaintiff knew she still owed money on her loans, and they submitted what they insist is an email from Mr. Nwabuisi to Plaintiff detailing the amounts outstanding as of November 2010.  (Defs.' Ex. 56 at 1.)  Based on its placement at the end of the email chain, it appears that Defendants claim this email was sent on or around November 29, 2010.  However, Plaintiff testified that she did not remember this email being part of the original email chain (Tr. at 335:16–24), and the Court agrees that this email is not probative.  Whereas all of the other emails in this chain have a heading containing four fields—From: [sender]; Sent: [date]; To: [recipient]; Subject: [subject]—this email's heading contains only the fields "To:" and "Subject", making it impossible to determine when it was sent.  In light of the fact that all of the other emails in this chain contain a "Sent:" field, the Court suspects that the "Sent:" field was deliberately deleted before this email was printed in order to make it look like it had been sent at the end of November 2010.  Nowhere else in the email chain do the Nwabuisis mention that Plaintiff still owed money on her loans.

59.     Defendants presented no other evidence that Plaintiff still owed money on the loans.  Ms. Nwabuisi testified only that she had never agreed to "forgive" any loans.  (Tr. at 386:20–21.)  The loan documents themselves state that "[s]hould there still be a Balance left" when the employee leaves Resource,

29

"the employee should arrange to pay the Balance within 10 days of leaving the company."  (Pl.'s Ex. 8 at 1.)  Those documents also state that "[t]he company will use whatever means necessary including legal action to collect the remaining balance."  (Id.)  However, aside from the aforementioned email that the Court finds suspect, Defendants presented no evidence that they sought to collect the sum allegedly outstanding after Plaintiff's employment terminated in November 2010.

60.    In October of 2011, Plaintiff began working for Resource again, this time in its Austin office.  Plaintiff testified that there had been no discussion of any outstanding loan balance and no indication that Resource believed she owed more money.  (Tr. at 150:6–151:3.)

61.    Defendants presented no evidence that Plaintiff's reemployment was conditioned upon her repaying any sum allegedly owed.  The Court finds that this was not a condition of Plaintiff's reemployment.

62.    Plaintiff worked from October 1 to 15, 2011, and received a paycheck for $0.90 to compensate her for those hours.  Defendants withheld the balance—$1,133.01—claiming that Plaintiff still owed money on the loans and $500 for missing petty cash.  (Defs.' Ex. 8.)

63.    Defendants presented no documentary evidence to support their claim that Plaintiff owed them $500 for missing petty cash.

64.     Plaintiff also worked from October 17 to 23, 2011, but she received no paycheck for this period.  (Pl.'s Ex. 5 at 33; Proposed Pretrial Order ¶ 11.) Defendants claim that they applied Plaintiff's paycheck to the loan and the allegedly missing petty cash.  (Defs.' Ex. 8.)

65.     Defendants' Exhibit 8, a demonstrative exhibit listing monies Plaintiff allegedly owes Defendants, alleges that Plaintiff also owes Defendants $200 for a cash advance.  However, Defendants did not introduce any evidence at trial to substantiate this claim.  Defendants' "Quick Reports" do not indicate that they advanced her $200 in wages.  (See Defs.' Ex. 53.)  Moreover, even though the other two loans Plaintiff obtained from Defendants are evidenced by a document entitled "Agreement to Loan Money or Advance Wages from the Company" (Defs.' Exs. 5, 6), Defendants did not introduce any such document evidencing the alleged $200 cash advance.  Accordingly, the Court concludes that Plaintiff does not owe Defendants for a $200 cash advance.

II.    <u>Conclusions of Law</u>

### Jurisdiction

66.     The Court has subject-matter jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331, which confers jurisdiction over claims arising under the laws of the United States.

### The <u>Mt. Clemens Pottery Co.</u> Burden-Shifting Framework

67.     The FLSA obligates employers to keep accurate records of the hours worked by employees.  29 U.S.C. § 211(c).  The Supreme Court has recognized that placing this burden on the employer furthers the Act's remedial purposes, because "[e]mployees seldom keep such records themselves," and "even if they do, the records may be and frequently are untrustworthy."  <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 686–87 (1946), <u>superseded by statute on other grounds</u>, Portal-to-Portal Act, Pub. L. No. 80–49, 61 Stat. 84 (1947).

68.     The employer's records need not follow a particular form, but they must include, among other things, the names and addresses of employees, the workweeks for which their salary or wages are paid, hours worked during each workweek, the compensation paid, and deductions taken from paychecks.  29 C.F.R. § 516.2(a)(1)–(12).

69.     "[W]hile there is nothing to prevent an employer from delegating to his employees the duty of keeping a record of their hours, the employer does so at his peril.  He cannot escape the record keeping provisions of the Act by delegating that duty to his employees."  <u>Goldberg v. Cockrell</u>, 303 F.2d 811, 814 n.1 (5th Cir. 1962); <u>accord</u> <u>Wirtz v. Miss. Publishers Corp.</u>, 364 F.2d 603 (5th Cir. 1966).

70.     Normally, "an employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that

he performed work for which he was not properly compensated." <u>Reeves v. Int'l</u> <u>Tel. & Tel. Corp.</u>, 616 F.2d 1342, 1351 (5th Cir. 1980), <u>abrogated on other</u> <u>grounds by</u> <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128 (1988).

71.    However, when an employer fails to keep complete and accurate records of an employee's hours, "[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." <u>Von Friewalde v. Boeing Aerospace Ops., Inc.</u>, 339 F. App'x 448, 455 (5th Cir. 2009) (quoting <u>Mt. Clemens Pottery Co.</u>, 328 U.S. at 687). Rather, in such a situation an employee is deemed to have met his burden

> if he proves that he has in fact performed work for which he was
> improperly compensated and if he produces sufficient evidence to
> show the amount and extent of that work as a matter of just and
> reasonable inference. The burden then shifts to the employer to come
> forward with evidence of the precise amount of work performed or
> with evidence to negative the reasonableness of the inference to be
> drawn from the employee's evidence. If the employer fails to produce
> such evidence, the court may then award damages to the employee,
> even though the result be only approximate.

<u>Id.</u> (quoting <u>Mt. Clemens Pottery Co.</u>, 328 U.S. at 687–88).

72.    In other words, "[w]hen an employer has failed to maintain the payroll records required by the Act, the employees' initial burden is to make out a prima facie case that the Act has been violated and to produce <u>some evidence</u> to show the amount and extent of the violation." <u>Beliz v. W.H. McLeod & Sons Packing Co.</u>, 765 F.2d 1317, 1330 (5th Cir. 1985) (emphasis added); <u>see also</u> <u>Reeves</u>, 616 F.2d

at 1351 ("Where the inaccuracy is due to the employer's failure to keep adequate records as required by statute, <u>imprecise evidence on quantum can provide a 'sufficient basis' for damages</u>." (emphasis added) (quoting <u>Mt. Clemens Pottery Co.</u>, 328 U.S. at 687)).

73.     A plaintiff need not provide documentary evidence to satisfy his burden.  <u>See</u> <u>Garner v. Chevron Phillips Chem. Co., L.P.</u>, 834 F. Supp. 2d 528, 546 (S.D. Tex. 2011) (explaining that a plaintiff may meet his initial burden through "plaintiff's testimony as to when and how many overtime hours he worked, plaintiff's affidavit to such, etc."); <u>accord</u> <u>Ventura v. Bebo Foods, Inc.</u>, 738 F. Supp. 2d 8, 13 (D.D.C. 2010) ("When assessing damages under the <u>Anderson</u> standard, a court may draw inferences from oral testimony, sworn declarations, and whatever relevant documentary evidence a plaintiff is able to provide."); <u>Rivera v. Ndola Pharmacy Corp.</u>, 497 F. Supp. 2d 381, 388 (E.D.N.Y. 2007) (explaining that a plaintiff "may meet this burden by relying solely on his or her recollection" (citing <u>Doo Nam Yang v. ACBL Corp.</u>, 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005)).  In <u>Reeves</u>, for example, the Fifth Circuit upheld an award of unpaid wages that was based on the plaintiff's estimate of the average number of hours he worked each week, which "corresponded to the rough computations of his subconscious mind." <u>Id.</u> at 1352.  Similarly, in <u>Beliz v. W.H. McLeod & Sons Packing Co.</u>, the Fifth Circuit held that a district court "was laboring [under] a

34

misconception of the legal standard" when it denied the plaintiffs recovery "based on [their] inability to produce the 'definite and certain' evidence thought necessary by the district court." 765 F.2d at 1330. The workers' "admittedly inexact or approximate evidence" of hours was sufficient. Id.; see also Colindres v. QuietFlex Mfg., 427 F. Supp. 2d 737, 752–53 (S.D. Tex. 2006) ("Evidence of hours worked need not be perfectly accurate as long as it provides a sufficient basis to calculate the number of hours worked by each employee.").

74. If, after the burden shifts to the employer, the employer fails to come forward with "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence," the court may award damages to the employee, even though the result be only approximate. Mt. Clemens Pottery Co., 328 U.S. at 687–88; see also Reeves, 616 F.2d at 1351(explaining that "[u]nder these circumstances [the Fifth Circuit has] 'in effect ordered the fact finder to do the best he could in assessing damages'" (quoting Mitchell v. Riley, 296 F.2d 614, 616 (5th Cir. 1961)); Calderon v. Presidio Valley Farmers Ass'n, 863 F.2d 384, 391 (5th Cir. 1989) (explaining that "[a]bsolute precision . . . would have been impossible" and holding that the trial court's "sound estimates [were] adequate").

75. Underlying this burden-shifting framework is the idea that "[t]he employer cannot be heard to complain that the damages lack the exactness and

precision of measurement that would be possible had he kept records" in accordance with the Act. Mt. Clemens Pottery Co., 328 U.S. at 688; see also Mitchell v. Mitchell Truck Line, Inc., 286 F.2d 721, 725–26 (5th Cir. 1961) (explaining that an employer "cannot really complain that matters are left in great uncertainty" due to its own failure to keep accurate time and wage records). Where there is "certainty of damage and the only uncertainty [is] to its extent," a court must simply do its best to "to find some way in which damages can be awarded where a wrong has been done." Id.; accord Mt. Clemens Pottery Co., 328 U.S. at 688; see also 51B C.J.S. Labor Relations § 1463 ("Since uncertainty as to the measure or extent of damages does not bar recovery of damages, recovery under the Fair Labor Standards Act will not be precluded where the uncertainty lies only in the amount of damages arising from the statutory violation by the employer." (emphasis added)).

76.     As described in detail above, Defendants failed to keep accurate and complete records of the hours that Plaintiff worked.  Approximately half of the time cards Defendants produced do not indicate the day, month, or year to which they correspond.  See 29 C.F.R. § 516.2 (requiring records to contain this information).  Defendants submitted the same time card for two separate weeks, and the time cards for seven other weeks are not time cards at all; they are merely spreadsheets listing the employees' scheduled shifts for those weeks.  See U.S.

36

Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 789 (6th Cir. 1995) (holding, where employer had instructed employees to record only scheduled shift hours on their time sheets, not their actual hours worked, that the burden of proof shifted to the employer to show that it paid minimum wage for all hours worked).  Finally, even though Plaintiff has shown through testimony and documentary evidence that she performed marketing work and provider visits during her lunch break, after hours, and on weekends, none of this time is captured in Defendants' records. Tellingly, while Defendants repeatedly asserted that if Plaintiff had worked overtime hours there would be documentary evidence of the same, Defendants did not even produce records of the lunches and dinners Ms. Nwabuisi admits she attended with Plaintiff.  Clearly, Defendants' alleged "checks and balances" system—through which Martha Lewis would supposedly ensure that all hours worked were properly compensated—was ineffective, allowing countless compensable hours to go unrecorded.  Accordingly, Plaintiff is entitled to the Mt. Clemens Pottery Co. burden-shifting framework, and she need only prove the extent of the hours she worked as a matter of just and reasonable inference.  See Mt. Clemens Pottery Co., 328 U.S. at 687–88; see also Skipper v. Superior Dairies, Inc., 512 F.2d 409, 420 (5th Cir. 1975) ("[W]here records are not kept, the employer has to 'disprove' the evidence adduced on behalf of the employee."); Floridia v. DLT 3 Girls, Inc., 4:11-CV-3624, 2013 WL 127448, at *3 (S.D. Tex.

Jan. 9, 2013) ("Because Defendants failed to discharge their duty to maintain accurate time records . . . , the burden of proof shifts from the Plaintiff to Defendants."); Solano v. A Navas Party Prod., Inc., 728 F. Supp. 2d 1334, 1343 (S.D. Fla. 2010) ("Because Defendants' records fail to establish what hours Plaintiff worked for which weeks, and fail to contain the rate Plaintiff was compensated for his work, they are not 'proper and accurate.'  Plaintiff may prove his damages under the relaxed burden-shifting scheme.").

**Plaintiff's Overtime Claim**

A.     The FLSA's Overtime Requirements

77.     The FLSA provides that no employer shall employ an employee for more than forty (40) hours in a workweek unless such employee receives one and one-half times his or her regular rate of pay for each overtime hour worked.  29 U.S.C. § 207(a)(1).

78.     The "regular rate" is the employee's hourly rate as determined "by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid."  29 C.F.R. § 778.109.  Thus, "[t]he regular rate may vary from week to week."  Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 460 (1948).

79.    The FLSA defines "employ" as "to suffer or permit to work."  Id.

§ 203(g).  Under the "suffer or permit to work" rule, an employer must compensate

its employees even for work that is not expressly authorized if such work is

performed with the knowledge and acquiescence of management.  29

U.S.C. § 203(g); 29 C.F.R. § 785.11–12.  In other words, "[w]hen an employer

knows or has reason to believe that an employee is working for the employer's

benefit, the time spent by the employee is work time, even if the work was not

requested."  Johnson v. RGIS Inventory Specialists, 554 F. Supp. 2d 693, 709

(E.D. Tex. 2007) (citing 29 C.F.R. § 785.11).  This is true even where the

employer claims to have a policy against overtime.  See Von Friewalde v. Boeing

Aerospace Operations, Inc., 399 F. App'x 448, 460 (5th Cir. 2009) (holding that an

employer's "policy against unauthorized overtime offer[ed] no defense" where "his

managers were clearly aware that [the employee] was working overtime"); 29

C.F.R. § 785.12–13 ("[I]t is the duty of the management to exercise its control and

see that the work is not performed if it does not want it to be performed . . . . The

mere promulgation of a rule against such work is not enough.  Management has the

power to enforce the rule and must make every effort to do so.").  In other words,

"[a]n employer who is armed with [knowledge that an employee is working

overtime] cannot stand idly by and allow an employee to perform overtime work

without proper compensation, even if the employee does not make a claim for the

overtime compensation."  Newton v. City of Henderson, 47 F.3d 746, 748 (5th Cir. 1995).

      B.      Defendants Have Failed to Negate the Reasonableness of the Inferences to be Drawn from Plaintiff's Evidence As to Overtime Hours Worked

      80.     Because Defendants could not produce "evidence of the precise amount of work performed," Mt. Clemens Pottery Co., 328 U.S. at 687, their burden was to produce "evidence to negat[e] the reasonableness of the inference" raised by Plaintiff's evidence.  Id. at 687–88.  To this end, Defendants repeatedly argued that Plaintiff's claims were not credible because she had not produced documentary evidence of after-hours labor.  (See, e.g., Dkt. # 77 (Defs.' Closing Statement) at 7, 15.)  However, this complaint is both unfounded (because Plaintiff did produce documentary evidence in the form of calendars, emails, and PHC logs) and inapposite.  As explained above, the Mt. Clemens Pottery framework does not require Plaintiff to produce documentary evidence or to prove each hour she worked with unerring accuracy.  See Garner, 834 F. Supp. 2d at 546.  Again, an employer simply "cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records" in accordance with the Act.  Mt. Clemens Pottery Co., 328 U.S. at 688; see also Calderon, 863 F.2d at 391 (explaining that "absolute precision" is "impossible"

40

where the employer's records are inadequate and concluding that "sound estimates" are adequate for determining damages); Mitchell, 296 F.2d at 616 (acknowledging that in these circumstances the Fifth Circuit has "in effect ordered the fact finder to do the best he could in assessing damages").

81.     Defendants' own time cards showed that Plaintiff was clocking more than forty hours per week.  See Chao, 514 F.3d at 287 (imputing knowledge of overtime work to employer where such information "was communicated to [the employer] each week on the [employees'] time sheets").  In some weeks, Plaintiff clocked forty-seven, forty-eight, or even forty-nine hours.  (See, e.g., Defs.' Ex. 45 (week of Aug. 1, 2010), 42 (week of June 27, 2010), 44 (week of July 18, 2010)). If Defendants did not want Plaintiff to work overtime hours, it was their responsibility to exercise control to make sure that she did not.  29 C.F.R. § 785.13.  To the extent that Defendants tried to argue that Plaintiff was simply surfing the internet or dealing with other personal matters during the extra hours captured on her time sheet, the Court does not find this explanation compelling: A bad employee could surf the internet during work hours; she would not come into the office an hour early or stay an hour late to do so.  Thus, Defendants did not negative the reasonableness of the inference to be drawn from these time cards— namely, that Plaintiff was actually working during the times they capture.

82.     Furthermore, the evidence shows that Ms. Nwabuisi had actual knowledge that Plaintiff often used her lunchtime to meet with case workers and advertise Resource's services.  Ms. Nwabuisi even testified that she accompanied Plaintiff on some of these lunch and dinner meetings.  Because Plaintiff was using these lunch and dinner meetings to generate additional business for Resource and to maintain good business relationships between Resource and case managers, this was compensable work time.  29 C.F.R. § 785.7, 785.28; Dunlop v. City Elec., Inc., 527 F.2d 394, 401 (5th Cir. 1976) (explaining that even an activity performed outside normal work hours represents compensable work time if it is "necessary to the business and is performed . . . primarily for the benefit of the employer, in the ordinary course of that business"); see also Bernard v. IBP, Inc. of Neb., 154 F.3d 259, 264-65 (5th Cir. 1998) (explaining that, when determining whether a meal period is excepted from compensated work time under the FLSA, "[t]he critical question is whether the meal period is used predominantly or primarily for the benefit of the employer or for the benefit of the employee" (citing 29 C.F.R. § 785.19)).  Far from negating the reasonableness of Plaintiff's evidence regarding uncompensated lunch and dinner meetings, Defendants' evidence supports her claim:  Ms. Nwabuisi testified that Plaintiff had attended such meals but that she had not been paid for that time because she had "volunteered" to go

42

and because the meals were for "marketing," not for "work."  (Tr. at 265:15–266:17; 266:5–8.)

83.    Defendants required Plaintiff to use her personal cell phone and later to carry an office cell phone in order to coordinate provider visits.  For the reasons given above, Defendants knew that some provider visits were scheduled for after 5:00 p.m. and on weekends; accordingly, they knew or should have known that Plaintiff would be required to work on evenings and weekends to coordinate floaters, and they failed to negative the reasonableness of Plaintiff's testimony that she often did so.

84.    Plaintiff produced PHC logs (Pl.'s Ex. 15.) showing that she had performed provider visits on the weekend, and Defendants did not challenge the authenticity or accuracy of these documents.  Moreover, as described above, both Ms. Nwabuisi and Ms. Flores testified that provider visits took place after hours and on weekends.  Thus, Defendants failed to contradict the evidence Plaintiff presented indicating that they knew or should have known that Plaintiff was performing provider visits on the weekend.

85.    Plaintiff submitted calendars detailing some of the marketing activities she performed on the weekends, during her scheduled lunch break, and after her shift.  Defendants did not deny that Plaintiff had in fact faxed these calendars to their Houston office; nor did they deny that Plaintiff had been

reimbursed based on the receipts that she sent along with them.  In fact, defense witness Martha Lewis testified that Plaintiff had regularly submitted receipts from marketing lunches with caseworkers.  (Tr. at 448:19–25.)  Plaintiff even emailed Rose Nwabuisi regarding coordinating marketing activities.  (See Pl.'s Ex. 16.) Accordingly, Defendants knew or should have known that Plaintiff was performing marketing work outside of normal business hours, and they failed to negative the reasonableness of the inference raised by Plaintiff's evidence regarding these activities.  Tellingly, even though Defendants claimed to have produced all records of Plaintiff's compensable time, Plaintiff—not Defendants—produced these documents, which were some of the few records she still had in her possession.

86.     Finally, Defendants readily admitted that Plaintiff performed after-hours skilled nursing visits and argued that she was properly paid a lump sum per visit, regardless of how long the visit took.  (See, e.g., Dkt. # 77 at 11.) Defendants' evidence on the subject of after-hours skilled nursing visits did not negative the reasonableness of Plaintiff's testimony; instead, it confirmed that Defendants did not properly compensate Plaintiff for these hours.  From the initiation of this case through trial, Defendants continued to assert that they had complied with the FLSA because the lump sum Plaintiff received for these visits was greater than what she would have received had she been paid at an overtime rate.  (See, e.g., Tr. at 309:14–19.)  However, even assuming that the lump sum

Plaintiff received was greater than what she would have been entitled to otherwise, such a payment does not qualify as an overtime payment under the FLSA. See 29 C.F.R. § 778.310 ("A premium in the form of a lump sum which is paid for work performed during overtime hours without regard to the number of overtime hours worked does not qualify as an overtime premium even though the amount of money may be equal to or greater than the sum owed on a per hour basis."). As the applicable regulation explains:

> If the rule were otherwise, an employer desiring to pay an employee a fixed salary regardless of the number of hours worked in excess of the applicable maximum hours standard could merely label as overtime pay a fixed portion of such salary sufficient to take care of compensation for the maximum number of hours that would be worked. The Congressional purpose to effectuate a maximum hours standard by placing a penalty upon the performance of excessive overtime work would thus be defeated.

Id. "To qualify as an overtime premium . . . the extra compensation for overtime hours must be paid pursuant to a premium rate which is likewise a rate per hour." 29 C.F.R. § 778.308. Thus, "where extra compensation is paid in the form of a lump sum for work performed in overtime hours, it must be included in the regular rate and may not be credited against statutory overtime compensation due." 29 C.F.R. § 778.310 (emphasis added).

87. During the weeks that Plaintiff performed skilled nursing visits and was paid $30 or $35 per visit, her "regular rate" is calculated by dividing the total compensation she received for that workweek by the number of hours that

45

compensation was intended to cover.  <u>See</u> 29 C.F.R. § 778.109.  For example, in

the workweek ending on August 23, 2009, Plaintiff performed four skilled nursing

visits and was compensated $35 for each visit.  During that pay period Plaintiff

was compensated for forty hours of labor and $140 for the skilled nursing visits.

Because the nursing visits lasted a total of 4.75 hours, Plaintiff's regular rate for

this week was $18.60[4], and her overtime rate was $27.90.

88.    By openly acknowledging that they did not pay Plaintiff according to

the calculation described in the preceding paragraph, Defendants in effect

acknowledge that they did not comply with the FLSA.[5]  Moreover, by arguing that

---

[4] (($17.31*40) + $140) / 44.75 hours = $18.60/hour.

[5] To the extent that Defendants asserted for the first time in their closing statement
that the lump-sum payment Plaintiff received for skilled nursing visits was "not a
lump sum attribut[able] to overtime but [w]as a separate contractual arrangement
for skilled nursing visits" (Dkt. # 77 at 27 (citing 29 U.S.C. § 207(f))), the Court
rejects this argument.  First, the Court notes that Plaintiff would be unduly
prejudiced if Defendants were permitted to assert this affirmative defense—which
was not pleaded in the Defendants' Original or Amended Answer—after the close
of testimony.  <u>See</u> <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 196–97 (1974)
("[T]he application of an exemption under the Fair Labor Standards Act is a matter
of affirmative defense on which the employer has the burden of proof.").  In any
case, however, Defendants have presented no evidence to support their claim that
Plaintiff was paid in a lump sum for skilled nursing visits pursuant to a bona fide
<u>Belo</u> plan.  The <u>Belo</u> plan exception is narrowly drawn to provide the "'security of
a regular weekly income'" to "employees whose work necessitates wide and
unpredictable fluctuations in hours."  <u>Donovan v. Brown Equip. & Serv. Tools,
Inc.</u>, 666 F.2d 148, 153 (5th Cir. 1982) (quoting <u>Walling v. A.H. Belo Corp.</u>, 316
U.S. 624, 635 (1942)).  Under 29 U.S.C. § 207(f), such plans are excepted from the
usual overtime pay requirements only if they meet each of the following
conditions, which are specified in the statute: (1) the duties of the employee must
"necessitate irregular hours of work"; the employee must be employed pursuant to

Plaintiff is improperly seeking "double" compensation for the time she spent

performing skilled nursing visits (see Dkt. # 77 at 9), Defendants demonstrate that

they misunderstand core precepts of the FLSA.  Defendants argue that Plaintiff

"wishes to keep her $30.00 to $35.00 per hour that she has been paid . . . and in

addition, add the time for these skilled nursing visits to her normal working week,

seeking in effect double recovery . . . ."  However, Defendants fail to understand

that each hour worked must be counted to determine how many hours Plaintiff

worked in a workweek and to determine her regular rate for that workweek.  29

C.F.R. § 785.7.  By arguing that this calculation—the calculation required by the

FLSA—is somehow "double" accounting, Defendants demonstrate that they do not

understand their obligations under the FLSA, further supporting the inference that

Plaintiff was not properly compensated.[6]

---

a bona fide individual contract or collective bargaining agreement; and (3) that
contract must "specif(y) a regular rate of pay" for hours up to forty and one and
one-half times that rate for hours over forty.  Donovan, 666 F.2d at 153 (citing 29
U.S.C. § 207(f)).  Defendants presented no evidence that any of these three
requirements were satisfied in this case and thus have given the Court no reason to
conclude that the lump sums Plaintiff was paid should be excluded from the
calculation of her regular rate.

[6]  On cross-examination, Defendants' counsel asked Plaintiff whether the skilled
nursing visits she performed were part of her claim, considering she had "be[en]
paid for those visits."  (Tr. at 306:16–17.)  Plaintiff, who was obviously confused
by the question, stated that she did not believe those visits formed part of her
overtime claim.  (Tr. at 306:18–19.)  In their closing statement, Defendants
asserted that, because Plaintiff had testified that the skilled nursing visits "no
longer encompass[ed] any part of her claim," they should not be taken into account
in any damage calculation.  (Dkt. # 77.)  However, Plaintiff is not an attorney, and

C.      Estimate of Average Number of Hours Worked in a Workweek

89.     Without complete and accurate records of Plaintiff's compensable time, the Court must simply "do the best [it can] in assessing damages.'" Reeves, 616 F.2d at 1351 (quoting Mitchell, 296 F.2d at 616).

90.     For the reasons given above, the Court concludes that Plaintiff has shown as a matter of fair and reasonable inference that she worked a substantial number of hours before and after her regularly scheduled shift and on the weekends.  However, because the Court has found that some of Plaintiff's estimates as to hours worked (such as her estimate of weekend work during the first six months of her employment) were not substantiated in the record, the Court revises downward Plaintiff's estimate of the total number of hours she worked in an average week.

91.     Plaintiff estimated that, in light of her many responsibilities, she generally began working between 7:00 a.m. and 9:00 a.m. Monday through Friday. (Tr. at 38:19–24; 158:20–25.)  Based on Plaintiff's time cards and evidence that Plaintiff often had to coordinate provider visits in the morning, the Court finds that this estimate is accurate.

---

the Court does not expect her to understand how overtime is calculated under the FLSA.  The fact of the matter is that Plaintiff did perform after-hours skilled nursing visits—again, Defendants do not deny this—and was not properly compensated for her time.  Accordingly, the Court rejects Defendants' contention that Plaintiff abandoned any claim based on the skilled nursing visits.

92.     Plaintiff estimated that she finished working around 8:00 or 9:00 p.m.

Monday through Friday.  (Tr. at 38:19–24; 158:20–25.)  The Court finds that

Plaintiff did often work until 8:00 or 9:00 p.m., whether she was in the office

working on skilled paperwork, performing provider or skilled nursing visits, or

planning or attending marketing events and dinners.  However, in light of all the

testimony and documentary evidence, the Court finds that Plaintiff exaggerated the

extent of her after-hours marketing efforts and the number of hours she spent

performing direct patient care.  Accordingly, the Court determines that Plaintiff

worked until 8:00 or 9:00 p.m. on an average of three days per week, not every

day.

93.     The Court further finds that Plaintiff worked through lunch an average

of three days per week.

94.     Finally, Plaintiff estimated that she worked an average of five or six

hours each weekend attending marketing events, preparing baskets for marketing,

and coordinating or performing provider service visits.  (Tr. at 39:2–5; 52:5–6.)

Defendants failed to negative the reasonableness of Plaintiff's evidence regarding

the provider visits and skilled nursing visits she coordinated and performed on the

weekends.  However, as described above, the Court finds that Plaintiff

overestimated the number of weekends she spent hosting marketing tables and

bingo games.  Accordingly, the Court revises downward Plaintiff's estimate and finds that she performed an average of four hours of weekend work per week.

95.     In light of the foregoing, the Court concludes that, while the proportion of Plaintiff's time that was dedicated to marketing, office management, or patient care fluctuated over the course of her employment, during a typical workweek in the San Antonio office, Plaintiff worked a total of approximately fifty-eight hours.  The Court further concludes that Plaintiff did not work any overtime during her first week of employment, which was a training period.

### Plaintiff's Minimum Wage Claim

96.     The FLSA provides that every employer shall pay a minimum wage to its employees.  29 U.S.C. § 206(a).  The minimum wage is currently $7.25 per hour.  Id. § 206(a)(1)(C).

97.     Plaintiff's time card for October 1 to 15, 2011, shows that she clocked 67 hours and 37 minutes during that time period. Plaintiff testified that she worked a standard workweek from October 3 to 8 and that she performed patient outreach after normal business hours from October 9 to 15.  (Tr. at 39:25–40:5.)  The Court credits this testimony, in part because Plaintiff submitted copies of work-related emails she had sent to Ms. Nwabuisi and Sabrina Flores at 9:30 p.m. on the night of October 10, 2011.  (Pl.'s Ex. 16.)  Thus, the Court concludes that Plaintiff

worked approximately forty hours for the week of October 3 to 8, 2011, and that she worked approximately fifty hours from October 9 to 15, 2011.

98.    Plaintiff's pay stub for October 1 to 15, 2011, purported to pay her for just 60.07 hours, more than seven hours fewer than Defendants' own time card shows Plaintiff clocked (and much less than Plaintiff testifies she worked).  (Defs.' Ex. 52 at 37.)  Moreover, because Defendants purported to apply almost all of this paycheck to Plaintiff's loans, Plaintiff received a paycheck for just $0.90—far below the minimum wage—for this pay period.  (Defs.' Ex. 8.)

99.    Defendants' pay stub shows that Plaintiff worked for at least 21.22 hours from October 17 to 23, 2011.  (Defs.' Ex. 52 at 37.)  Plaintiff testified that she worked additional hours performing outreach with refugee families in the evening during this week as well (Tr. at 39:25–40:5), and the Court estimates that Plaintiff worked fifty hours during this week.

100.   Plaintiff did not receive a paycheck for this time period.  (Proposed Pretrial Order ¶ 11.)

101.   Because Plaintiff worked for approximately forty hours during the first week and approximately fifty hours during each of her last two weeks, and because her regular rate during this time period was $25 per hour, the Court concludes that she is entitled to $1,000 in wages for the week of October 2 to 8, 2011 ($25/hour * 40 hours = $1,000) and to $1,375 for each of the latter two weeks

51

(($25/hour * 40 hours) + ($37.5/hour * 10 hours) = $1,375), for a total of $3,750

for this time period.

102.   To the extent that Defendants seek to offset the amount of wages

owed to Plaintiff for October 2011 by $500 for allegedly missing petty cash and

$200 for an alleged cash advance, the Court notes that, with limited exceptions,

such set-offs and counterclaims are not permitted in FLSA cases.  In a recent case,

the Fifth Circuit considered and rejected the defendant's request for a set-off

against overtime wages owed for a large severance payment it had paid the

plaintiff in exchange for a waiver of employment claims, noting the "longstanding

prohibition of set-offs in FLSA cases."  See Martin v. PepsiAmericas, Inc., 628

F.3d 738, 742 (5th Cir. 2010).  The rationale behind such a policy is as follows:

> The FLSA decrees a minimum unconditional payment and the
> commands of that Act are not to be vitiated by an employer, either
> acting alone or through the agency of a federal court.  The federal
> courts were not designated by the FLSA to be either collection agents
> or arbitrators for an employee's creditors.  Their sole function and
> duty under the Act is to assure to the employees of a covered
> company a minimum level of wages.  Arguments and disputations
> over claims against those wages are foreign to the genesis, history,
> interpretation, and philosophy of the Act.  The only economic feud
> contemplated by the FLSA involves the employer's obedience to
> minimum wage and overtime standards.  To clutter these proceedings
> with the minutiae of other employer-employee relationships would be
> antithetical to the purpose of the Act.  Set-offs against back pay
> awards deprive the employee of the 'cash in hand' contemplated by
> the Act, and are therefore inappropriate in any proceeding brought to
> enforce the FLSA minimum wage and overtime provisions . . . .

Brennan v. Heard, 491 F.2d 1, 4 (5th Cir. 1974) (emphases added), overruled on other grounds by McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988); see also Gagnon v. United Technisource, Inc., 607 F.3d 1036 (5th Cir. 2010) (dismissing employer's breach-of-contract counterclaim as inappropriate in an FLSA case and holding that the employer was not entitled to a set-off for the purported value of such claim); Donovan v. Pointon, 717 F.2d 1320, 1323 (10th Cir. 1983) (explaining that an FLSA claim is an enforcement of a public right, and permitting private counterclaims, "real or imagined, . . . would delay and even subvert" the goals of the FLSA by further delaying the payment of lawfully owed wages). Accordingly, Defendants may not set off the amount they owe Plaintiff by the amount of these sums she allegedly owes them.

## Total Unpaid Wages

103.   Using the regular-rate calculation described above, and factoring in the lump-sum payments that Plaintiff received for skilled nursing visits (as evidenced by the skilled nursing notes (Defs.' Ex. 54)), the Court calculates Plaintiff's unpaid wages as follows:

| Time Period | Hours Worked | Reg. Rate ("RR") | Overtime Rate | Wages Received | Wages Should Have Received | Wages Owed | Notes |
|---|---|---|---|---|---|---|---|
| June 21–27, 2009 | 40 | $15 | $22.50 | $600 | $600 | $0 | Training – No OT |
| June 28–July 12 | 174 (3 weeks) | $15 | $22.50 | $1,800 | $3,015 | $1,215 | |
| July 13–19 | 58 | $15/ $17.31 | $22.50/ $25.97 | $636.96 | $1,327.20 | $690.24 | RR changed on 7/16 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| July 20–Aug. 16 | 232 (4 weeks) | $17.31 | $22.50/ $25.97 | $2,769.60 | $4,639.44 | $1,869.84 | |
| Aug. 17–23 | 58 | $18.60 | $27.90 | $832.40 | $1,246.20 | $413.80 | Factored 4 nursing visits into RR |
| Aug. 24–30 | 58 | $18.23 | $27.34 | $797.40 | $1,221.32 | $423.92 | 3 nursing visits |
| July 31, 2009–Jan. 3, 2010 | 1044 (18 weeks) | $17.31 | $25.97 | $12,463.20 | $20,877.48 | $8,414.28 | |
| Jan. 4–10 | 58 | $18.24 | $27.36 | $762.40 | $1,222.08 | $459.68 | 2 nursing visits |
| Jan.11–24 | 116 (2 weeks) | $17.31 | $25.97 | $1,384.80 | $1,852.26 | $467.46 | |
| Jan. 25–31 | 58 | $18.02 | $27.03 | $762.40 | $1,207.34 | $444.94 | 2 nursing visits |
| Feb. 1–7 | 58 | $17.62 | $26.43 | $727.40 | $1,180.54 | $453.14 | 1 nursing visit |
| Feb. 8–14 | 58 | $17.84 | $26.76 | $727.40 | $1,195.28 | $467.88 | 1 nursing visit |
| Feb. 15–Mar. 28 | 348 (6 weeks) | $17.31 | $25.97 | $4,154.40 | $6,959.16 | $2,804.76 | |
| Mar. 29–Apr. 4 | 58 | $17.62 | $26.43 | $727.40 | $1,180.54 | $453.14 | 1 nursing visit |
| Apr. 5–11 | 58 | $17.31 | $25.97 | $692.40 | $1,159.86 | $467.46 | |
| Apr. 12–18 | 58 | $17.62 | $26.43 | $727.40 | $1,180.54 | $453.14 | 1 nursing visit |
| Apr. 19–25 | 58 | $17.31 | $25.97 | $853.38[7] | $1,159.86 | $306.48 | |
| Apr. 26–May 2 | 58 | $17.84 | $26.76 | $727.40 | $1,180.54 | $453.14 | 1 nursing visit |
| May 3–9 | 58 | $18.24 | $27.36 | $762.40 | $1,207.34 | $444.94 | 2 nursing visits |
| May 10–16 | 58 | $17.62 | $26.43 | $727.40 | $1,180.54 | $453.14 | 1 nursing visit |
| May 17–23 | 58 | $18.02 | $27.03 | $762.40 | $1,207.34 | $444.94 | 2 nursing visits |
| May 24–June 13 | 174 (3 weeks) | $17.31 | $25.97 | $2,077.20 | $3,479.58 | $1,402.38 | |

[7] Plaintiff's pay stub shows she was paid for 97.3 hours, all at her regular rate, for the pay period from April 16 to 30, 2010. (Defs.' Ex. 38.)  Because it is not possible to determine with accuracy the workweek(s) to which the additional 9.3 hours are attributable, the Court credits the additional compensation Plaintiff received in this pay stub to the week of April 19 to 25, 2010.

| June 14–20 | 58 | $18.02 | $27.03 | $762.40 | $1,207.34 | $444.94 | 2 nursing visits |
| June 21–27 | 58 | $18.30 | $27.45 | $797.40 | $1,226.64 | $429.00 | 3 nursing visits |
| June 28–July 4 | 58 | $17.99 | $26.98 | $797.40 | $1,205.24 | $407.84 | 3 nursing visits |
| July 5–11 | 58 | $17.62 | $26.43 | $727.40 | $1,180.54 | $453.14 | 1 nursing visit |
| July 12–18 | 58 | $18.84 | $28.27 | $737.92 | $1,262.46 | $524.54 | RR changed on 7/15; 1 nursing visit |
| July 19–25 | 58 | $23.63 | $35.44 | $1,025.00 | $1,583.12 | $558.12 | 3 nursing visits |
| July 26–Oct. 31 | 812 (14 weeks) | $23.00 | $34.50 | $13,043.90[8] | $21,574.00 | $8,530.10 | |
| Oct. 3–9, 2011 | 40 | $25.00 | $37.50 | $0.00 | $1,000.00 | $1,000.00 | |
| Oct. 10–16 | 50 | $25.00 | $37.50 | $0.90 | $1,375.00 | $1,374.10 | |
| Oct. 17–23 | 50 | $25.00 | $37.50 | $0 | $1,375.00 | $1,375.00 | |

**Total Unpaid Wages**: $38,100.49

## Liquidated Damages

104.   Any employer who violates Section 206 or Section 207 shall be liable to the aggrieved employee in the amount of the employee's unpaid compensation and in an additional equal amount as liquidated damages.  29 U.S.C. § 216(b).

105.   Liquidated damages are compensatory, not punitive, in nature. Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706 (1945) ("[T]he liquidated damages provision is not penal in its nature but constitutes compensation for the

---

[8] Plaintiff's pay stub for July 16 to 31, 2010, shows that she was paid for 98 hours (92 at her regular rate of $23 and 6 at $30) rather than for 96 hours at a rate of $23. Similarly, Plaintiff's pay stub for September 16 to 30, 2010, shows that she was compensated for 91.3 hours rather than 88 hours, all at a rate of $23/hour.  The Court has factored the extra $163.90 into this total.

retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages.").  A court must grant liquidated damages under Section 216 of the FLSA unless the employer meets its substantial burden of persuading the court that its act or omission was both in good faith and reasonable.  Lowe v. Southmark Corp., 998 F.2d 335, 337–38 (5th Cir. 1993); Singer v. Waco, 324 F.3d 813, 823 (5th Cir. 2003); Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 468 (5th Cir. 1979).  Under section 260, "good faith requires some duty to investigate potential liability under the FLSA."  Barcellona, 597 F.2d at 469; see also Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir. 1971) ("Stated most simply, we think the test should be: Did the employer know the FLSA was in the picture?").

106.   At the summary-judgment stage, this Court found that Defendants had not met their "'substantial burden' of proving . . . that [their] acts giving rise to the suit [were] both in good faith and reasonable."  Mireles v. Frio Foods, Inc., 899 F.2d 1407, 1415 (5th Cir. 1990).  (Dkt. # 46 at 25–26.)  In particular, the Court noted that Ms. Nwabuisi had conceded "that Defendants [had] not consult[ed] an accountant, attorney, or any other professional with knowledge regarding FLSA compliance even after [another] employee [had] filed suit against them under the FLSA."  (Dkt. # 46 at 26.)  Because Defendants knew or had reason to know that their conduct was governed by the FLSA, the Court concluded that they had not

shown good faith.  See Reeves, 616 F.2d at 1353 ("Lack of good faith is

demonstrated when an employer knows, or has reason to know, that his conduct is

governed by the [FLSA]." (internal quotation marks omitted)).  Defendants

presented no evidence at trial to undermine that conclusion.  Accordingly, as

required by 28 U.S.C. § 216(b), Plaintiff is entitled to liquidated damages in an

amount equal to her unpaid compensation:  $38,425.36.

**Willfulness**

107.   The statute of limitations for an FLSA claim for unpaid overtime

compensation is two years.  29 U.S.C. § 255(a). In the case of a willful violation,

the limitations period is extended to three years.  Id.

108.   Under the FLSA, a violation is "willful" if the employer either "knew

or showed reckless disregard for . . . whether its conduct was prohibited by the

statute."  Singer v. City of Waco, Tex., 324 F.3d 813, 821 (5th Cir. 2003) (quoting

McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).  The burden of

showing that an FLSA violation was "willful" falls on the plaintiff.  See id.; see

also Samson v. Apollo Res., Inc., 242 F.3d 629, 636 (5th Cir. 2001) ("Generally, a

plaintiff suing under the FLSA carries the burden of proving all elements of his or

her claim.").

109.   For the reasons given in this Court's order dated May 10, 2013,

Plaintiff has met her burden of showing that Defendants willfully violated the

57

FLSA (Dkt. # 46 at 29–30) and is therefore entitled to a three-year limitations period.

## Attorney's Fees

110.   The FLSA provides that "[t]he court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."  29 U.S.C. § 216(b); <u>accord</u> <u>Saizan v. Delta Concrete Prods. Co.</u>, 448 F.3d 795, 799 n.7 (5th Cir. 2006).  Thus, Plaintiff is entitled to recovery of her reasonable attorney's fees and costs.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court **ORDERS** that judgment be entered in favor of Plaintiff and against Defendants in the amount of:

(1) $38,100.49 in unpaid wages;

(2) $38,100.49 in liquidated damages; and

(3) Reasonable attorney's fees and costs.

Plaintiff is directed to file a motion for her reasonable attorney's fees and costs, along with supporting documentation, within fourteen (14) days of this Order.  Defendants shall have fourteen (14) days to file objections.  The Court shall decide the amount of fees and costs to be awarded on the basis of the parties' submissions.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, January 2, 2014.

_____

David Alan Ezra
Senior United States Distict Judge